IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALFRED VINCENT AMBRIZ,

          Plaintiff,                  No. CIV S-05-1298 JAM EFB P

     vs.

SCOTT KERNAN, et al.,

          Defendants.          FINDINGS AND RECOMMENDATIONS

_____/

      Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983.  This action proceeds on the January 5, 2006, second amended complaint which claims the following:  (1) defendants Hill, Holmes and Kennedy deprived plaintiff of his right to practice his religion on C Facility from 1999 through 2005; (2) Hill, Holmes and Kennedy held plaintiff in the Security Housing Unit on C facility from 1999 through 2005 in violation of the Equal Protection Clause of the Fourteenth Amendment; and (3) Hill, Holmes and Kennedy discriminated against plaintiff based on race in the assignment of prison jobs, in permitting access to recreational equipment on the yard, and in discipline.  The remaining defendants have moved for summary judgment and for the reasons explained below, the motion must be granted.

////

////

**I.  Facts & Background**

    **A.  Plaintiff**

        At all times relevant to this action, plaintiff was a prisoner confined at California State Prison, Sacramento ("CSP Sac").  He arrived there on June 19, 1999, and was housed on C Facility.  Defs.' Mot. for Summ. J., Attach. 1, Stmt. of Undisp. Facts ("SUF"), SUF 6.  He was moved to A Facility on December 27, 1999, and remained there until April 19, 2001, when he returned to C Facility.  SUF 47.  Then on December 7, 2002, he was moved back to A-Facility where he remained until October 9, 2003, when he was again returned to C Facility.  SUF 48.  On September 6, 2005, plaintiff was moved into special housing pending his transfer to a different prison.  SUF 49.

    **B.  Defendant Hill**

        From 1999 through 2005, defendant Hill was a guard at CSP Sac.  Defs.' Mot. for Summ. J., Ex. A, Hill Decl., at ¶ 1.  With the exception of approximately two months in the year 2000, Hill did not work in C Facility until he was made captain of that facility in December 2004.  *Id.*, at ¶ 2.  As the facility captain, Hill met with the warden to discuss the modified program (discussed below) that was implemented on Facility C. *Id.*, at ¶ 2.

    **C.  Defendant Holmes**

        Defendant Holmes was a guard on C Facility at CSP Sac between 1998 and 2000.  Defs.' Mot. for Summ. J., Ex. B, Holmes Decl., at ¶ 1.  In 2002, he became a sergeant on C Facility, and held that position until the end of April 2004, when he was promoted to lieutenant.  *Id.*, at ¶ 1. In June 2004, he was assigned to A Facility, where he remained until the end of  January 2005.  While he worked on A Facility, he had no duties or authority within C Facility.  *Id*., at ¶ 2. He returned to his position as a lieutenant in C Facility in February 2005.  *Id.*

    **D.  Defendant Kennedy**

        Defendant Kennedy has worked at CSP Sac since February 18, 2002.  Defs.' Mot. for Summ. J., Ex. C, Kennedy Decl., ¶ 1.  At all times relevant to this action, he was a sergeant.  *Id.*

Kennedy did not work in or have any responsibilities, authority or control over anyone in C Facility from: (a) 1999 to May 19, 2002; (b) June 3, 2002 to May 16, 2004; (c) June 7, 2004, to August 15, 2004; (d) October 11, 2004, to May 15, 2005; and (e) June 5, 2005, to the present. SUF 66.

### E. Description of C Facility at CSP Sac

A substantial wall divides C-Facility into two sections - one on the east and one on the west.  On the east side is a simple concrete area without any recreational equipment.  SUF 28. On the west yard are concrete and grass exercise areas, a basketball court and other "recreational amenities."  *Id*.  The east side has small kitchens and limited employment opportunities.  SUF 33.  The main kitchen and work center, and therefore a relatively large number of job opportunities are in the west yard.  SUF 32.  Defendants have submitted declarations describing three possible ways prisoners can pass between the east and west yards despite the wall.  SUF 21 Two are sally ports, which connect the two yards and serve as areas for controlling movement between them.  SUF 22.  The third is the chapel, which is within the wall that divides the facility. SUF 23.  The chapel has two doors, which lock and unlock manually.  *Id*.  One door is on the east wall and one is on the west.  *Id*.  Because of the chapel's design, it is difficult to monitor prisoners in it.[1]  *Id*.  Prison officials therefore consider the chapel to be the least secure access point between the west and east sides of Facility C.  *Id*.

### F. Events Giving Rise to this Action

California prison officials consider two groups comprised of hispanic prisoners to be "disruptive groups."[2]  They categorize these groups as "Northern Hispanics" i.e., "Northerners,"

---

[1]  Defendants have submitted a diagram of the chapel attached to their motion for summary judgment as Exhibit D.

[2]  A "disruptive group" is "any gang other than a prison gang."  Hill Decl., at ¶ 5.  A "gang" is:

> any ongoing formal or informal organization, association or group
> of three or more persons which has a common name or identifying
> sign or symbol whose members and/or associates, individually or

and "Southern Hispanics," i.e., "Southerners." SUF 3.  Inmates belonging to both groups were housed on C Facility.  SUF 13.  Of the disruptive groups within California's prison system, the Northerners are one of the strongest and most organized.  SUF 5. When plaintiff arrived at CSP Sac on June 19, 1999, plaintiff was associated with the Northerners.[3]  SUF 7.  In relation to this association, he engaged in various activities, including the possession and concealment of weapons.  SUF 8.  As early as 1999, Investigative Services Unit[4] ("ISU") personnel at CSP Sac had information that Northerners and Southerners had standing orders from their respective leaders to attack each other on sight.  SUF 9.  In 1999, the warden of CSP Sac imposed a "modified program"[5] in an attempt to prevent members of the rival groups from coming into contact with each other.  SUF 10.

Because Southerners and Northerners were housed on C Facility, prison officials designed program schedules to alternate each group's access to programs and activities.  SUF 13. Under these alternate schedules one group would remain in its housing unit while the other had time for normal programming activities.  *Id*.  Thus, for example, Southerners had outdoor yard time during the day while Northerners were in their cells; then, in the evening, Northerners were given outdoor time while Southerners were in their cells.  *Id*.  During this time period,

---

> collectively, engage or have engaged on behalf of that organization, association or group, in two or more acts which include planning, organizing, threatening, financing, soliciting, or committing unlawful acts of misconduct."

Cal. Code Regs. tit 15, § 3000.

[3]  At some point, plaintiff dropped out but it is not clear when.  *See* Defs.' Mot. for Summ. J., Ex. G, Deposition of Plaintiff ("Pl.'s Dep."), at 15.

[4]  The Investigative Services Unit gathers and evaluates information about prison gangs and disruptive groups.  Defs.' Mot. for Summ. J., Ex. E, Villasensor Decl., ¶ 3.

[5]  A "modified program" entails the restriction of prisoners' programs and movement without imposing a blanket suspension of normal activities.  SUF 11.  This is in stark contrast to a "lockdown," during which all programs requiring movement of prisoners temporarily are suspended pending investigation of whatever event triggered the lockdown.  SUF 60.

4

Southerners had the opportunity to attend chapel during the day and Northerners had that opportunity in the evening.  SUF 14.  Any prisoner who needed emergency medical treatment received it.  SUF 12.  However, routine medical care was scheduled in such a way as to prevent Northerners and Southerners from coming into contact with each other.  *Id*.  No Northerner would be scheduled to enter the Facility C medical clinic at the same time as a Southerner.  *Id.*

There is no evidence of who made the schedules governing the programs and movement of Northerners and Southerners during this time.  However, defendants have submitted evidence that ISU personnel noticed that these measures decreased the violence between the groups, but did not eliminate it altogether.  SUF 15.  Attacks occurred when members of one group entered into an area occupied by members of the other, such as when a prisoner eluded an escorting officer or misrepresented his identity.  *Id*.

Because of the continued violence, the warden adjusted the modified program in September of 2002.  SUF 17.  First, she decided to house Northerners on the east side of C Facility, and Southerners on the west.  *Id*.  Members of one group were not permitted to enter the side occupied by the other.  *Id*.  Despite this measure, ISU personnel continued to receive information that Southerners had standing orders to attack Northerners on sight.  *Id*.  She also denied Northerners and Southerners access to the chapel. SUF 23.  However, after the imposition of this restriction, it was prison policy to make chaplains available to prisoners by having them walk the tiers.  SUF 26.

At deposition, plaintiff testified that he never saw a chaplain walking the tiers, but conceded that no one interfered with his ability to study the bible or to pray, both of which he did. Pl.'s Dep., at 36. At no time was plaintiff's opportunity to pray and study his religion in his cell restricted.  SUF 24, 25.  Although plaintiff was not visited by a chaplain while the modified program was in place, defendants assert in their declarations that they were not aware of this fact.  SUF 27.  Defendants have submitted declarations stating that they did not in any way prevent any chaplains from meeting with plaintiff.  *Id*.

Separating Northerners and Southerners by the wall dividing C Facility affected prisoners' access to recreational equipment and to jobs. Thus, after September of 2002, Northerners had access to the concrete area on the east side of the wall, where there were no recreational amenities. SUF 29. The only job opportunities available to Northerners were those that existed on the east side of the wall. SUF 31. For their part, Southerners had access to the recreational equipment and job assignments on the west side. SUF 30. After September 2002, plaintiff had a job on the east side of C Facility, where he was housed. SUF 34.

Defendants have submitted declarations asserting that the warden alone controlled the modified program. SUF 39. Only the warden had the authority to change or end the modified program. *Id.* No one else at CSP Sac could have altered or ended the program. SUF 39-42. At deposition, plaintiff testified that he named Holmes as a defendant because he was a program lieutenant for the yard, and as such attended meetings concerning the modified program. Pl.'s Dep., at 88. Plaintiff asserts that Holmes must have had "some kind of influence to be sergeant to lieutenant, so I'm sure he had some kind of influence on the C Facility, administration staff there." *Id.*, at 89. But plaintiff conceded that he was not aware of any particular act Holmes took that may have violated plaintiff's rights. *Id.*, at 116, 123. At deposition, plaintiff described Kennedy as a "facilitator," within the prison because "he was the sergeant that always went around to every building and tried to resolve or tried to be . . trying to bring things to peace." *Id.*, at 85. Plaintiff did not know whether Kennedy had any control over the lockdown or the modified program, but named him as a defendant, "[f]or him being in the same lawsuit, for him knowing the ongoing process, that modified program," even though plaintiff knew that Kennedy had no control over it. Pl.'s Dep., at 87. In short, when asked whether Kennedy did anything to violate plaintiff's rights, plaintiff conceded, "[n]o, he didn't do nothing to me." *Id.* Plaintiff agreed that he had no basis for suing defendant Kennedy. *Id.* at 122, 23. Plaintiff explained at deposition that he named Hill as a defendant because Hill "was a captain there at the yard. . . .

////

1   From once he decided to be a captain there, once they appointed him captain, he was involved in

2   that." *Id.*, at 89-90.  When asked what plaintiff believed Hill was involved in, plaintiff testified,

3   "I'm not sure." *Id.*, at 90.  Plaintiff admitted that he could not allege any particular act on the

4   part of defendant Hill that he believed violated his rights.  *Id.*, at 117, 123.

5        In sum, plaintiff testified at deposition that he could not state with any specificity when

6   Holmes, Kennedy or Hill violated his rights or what they did that would constitute such a

7   violation.  *Id.*, at 117.

8   **II.  Summary Judgment Standards**

9        Summary judgment is appropriate when it is demonstrated that there exists "no genuine

10  issue as to any material fact and that the moving party is entitled to a judgment as a matter of

11  law."  Fed. R. Civ. P. 56(c).

12              Under summary judgment practice, the moving party
                always bears the initial responsibility of informing the district
13              court of the basis for its motion, and identifying those portions of
                "the pleadings, depositions, answers to interrogatories, and
14              admissions on file, together with the affidavits, if any," which it
                believes demonstrate the absence of a genuine issue of material
15              fact.

16       Summary judgment avoids unnecessary trials in cases with no genuinely disputed

17  material facts.  *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468,

18  1471 (9th Cir. 1994).  At issue is "whether the evidence presents a sufficient disagreement to

19  require submission to a jury or whether it is so one-sided that one party must prevail as a matter

20  of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Thus, Rule 56 serves to

21  screen the latter cases from those which actually require resolution of genuine disputes over

22  material facts; e.g., issues that can only be determined through presentation of testimony at trial

23  such as the credibility of conflicting testimony over facts that make a difference in the outcome.

24  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

25       Focus on where the burden of proof lies as to the issue in question is crucial to summary

26  judgment procedures.  "[W]here the nonmoving party will bear the burden of proof at trial on a

1   dispositive issue, a summary judgment motion may properly be made in reliance solely on the

2   'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.*  Indeed,

3   summary judgment should be entered, after adequate time for discovery and upon motion,

4   against a party who fails to make a showing sufficient to establish the existence of an element

5   essential to that party's case, and on which that party will bear the burden of proof at trial.  *See*

6   *id.* at 322.  In such a circumstance, summary judgment should be granted, "so long as whatever

7   is before the district court demonstrates that the standard for entry of summary judgment, as set

8   forth in Rule 56(c), is satisfied."  *Id.* at 323.

9          The opposing party must establish that a genuine issue as to any material fact actually

10  exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To

11  overcome summary judgment, the opposing party must demonstrate a factual dispute that is both

12  material, i.e. it affects the outcome of the claim under the governing law, *see Anderson v. Liberty*

13  *Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*,

14  809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury

15  could return a verdict for the nonmoving party.  *See Wool v. Tandem Computers, Inc.*, 818 F.2d

16  1433, 1436 (9th Cir. 1987).  In this regard, "a complete failure of proof concerning an essential

17  element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*,

18  477 U.S. at 323.   In attempting to establish the existence of a factual dispute that is genuine, the

19  opposing party may not rely upon the allegations or denials of its pleadings but is required to

20  tender evidence of specific facts in the form of affidavits, and/or admissible discovery material,

21  in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475

22  U.S. at 586 n.11.  It is sufficient that "the claimed factual dispute be shown to require a jury or

23  judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv.*, 809 F.2d at

24  631.

25          Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the

26  proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587

1   (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  However, the

2   opposing party must demonstrate with adequate evidence a genuine issue for trial.

3   *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).  The opposing party must do

4   so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence

5   presented."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.  If the evidence presented

6   could not support a judgment in the opposing party's favor, there is no genuine issue.  *Id.*;

7   *Celotex Corp. v. Catrett*, 477 U.S. at 323.

8          In resolving a summary judgment motion, all reasonable inferences that may be drawn

9   from the facts placed before the court must be drawn in favor of the opposing party.  *See*

10  *Matsushita*, 475 U.S. at 587.  Nevertheless, the inferences must be reasonable.  Inferences are

11  not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate

12  from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp.

13  1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

14  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

15  some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could

16  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

17  trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

18         On March 8, 2006, the court informed plaintiff of the requirements for opposing a motion

19  for summary judgment.  *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert.*

20  *denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

21  **III.  Analysis**

22         Plaintiff asserts three claims.  First, he claims that defendants violated his right to

23  practice his religion from 1999 through 2005.  Second, he alleges that defendants violated his

24  right to equal protection under the law by holding him in the Facility C Security Housing Unit

25  from 1999 through 2005.  Third, he claims that defendants discriminated against him based on

26  his race with respect to job assignments, access to recreational equipment on the yard and in

1    disciplinary matters from 1999 through 2005.  Defendants contend that plaintiff's claims, which

2    accrued in 1999, are untimely.  With respect to plaintiff's other claims, defendants contend that

3    there is no genuine issue about whether they participated in any act resulting in the violation of

4    his rights.

5         **A.  Statute of Limitations**

6         Actions brought under 42 U.S.C. § 1983 are subject to the statute of limitations for

7    personal injury actions under the law of the forum state.  *Wilson v. Garcia*, 471 U.S. 261, 276

8    (1995).  However, federal law governs when a claim accrues.  *See Elliott v. City of Union City*,

9    25 F.3d 800, 801-02 (9th Cir. 1994).  A claim accrues when the plaintiff knows, or should know,

10   of the injury which forms the basis for the cause of action.  *See Kimes v. Stone*, 84 F.3d 1121,

11   1128 (9th Cir. 1996).  The forum state's law governs both statutory and equitable tolling.  *See*

12   *Hardin v. Straub*, 490 U.S. 536, 537-39 (1989); *Bacon v. City of Los Angeles*, 843 F.2d 372, 374

13   (9th Cir. 1988).

14        California's statute of limitations for an action based on a personal injury was one year

15   until January 1, 2003, when the legislature extended it to two years.  Cal. Code Civ. Pro.

16   § 340(3) (West 1982); Cal. Civ. Pro. Code § 351.1 (West 2006).  As applied to § 1983 cases, the

17   new limitation period is not retroactive.  *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004).

18   Thus, the one year period applies here.  For a plaintiff serving a prison term of less than life at

19   the time the cause of action accrues, the limitation period is tolled for up to two years while the

20   plaintiff is in prison.  Cal. Code Civ. Pro. § 352.1(a) (West 2006).  This exclusion applies to

21   actions by prisoners concerning the conditions of their confinement, or portions thereof, in which

22   the plaintiff seeks to recover damages.  Cal. Code Civ. Pro. § 352.1(c) (West 2006).  Defendants

23   have the burden of proving facts that would establish this affirmative defense.  *Fruit and*

24   *Vegetable Packers and Warehousemen Local 760 v. Morley*, 378 F.2d 738, 746 (9th Cir. 1967).

25        Here, defendants contend that the claims which accrued before September 13, 1999 are

26   untimely.  They point to the fact that plaintiff has previously demonstrated his awareness that he

can sue prison personnel for their alleged violation of his rights.  Plaintiff filed lawsuits in 1994 and 1998, and in 1999.  He also demonstrated his awareness of the alleged basis for his claims herein in 1999 when he filed a grievance complaining that the modified program violated his civil rights.  In response, plaintiff has not made any argument about the timeliness of this action.  Rather, he argues that his rights were violated from 1999 through 2005 without alleging with any particularity when.  At deposition, he conceded that he could not narrow down the time frame.  Nor does he address the issue of when he became aware of the facts forming the basis for his claims.

On this record, the court cannot find that there is a genuine issue about whether plaintiff's claims which accrued before September 13, 1999 are timely.   Therefore, defendants are entitled to judgment as a matter of law with respect to those claims.  Their motion must be granted with respect to this defense.

**B.  Defendants Hill, Holmes and Kennedy**

Even assuming his purported claims are not time barred, plaintiff has failed to demonstrate a genuine issue as to any material fact with respect to any of the claims.  Section 1983 creates a cause of action against any person who, acting under color of state law, deprives a citizen or person within the jurisdiction of the United Sates of a constitutional right.  42 U.S.C. § 1983.  A person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  Plaintiff failed to produce any evidence that any of these defendants engaged in some action or caused anyone else to act so as to violate his rights.  Indeed, at deposition he conceded that he had no evidence that any of these defendants did anything to violate his rights.  The concession is clearly dispositive.  Plaintiff said that he named Hill as a defendant because Hill was a captain on C Facility; and, therefore, he believed Hill was "involved" in something.  But plaintiff could not say what.  In fact, he

1    conceded that he could not identify any single act in which Hill engaged or caused someone else

2    to engage which resulted in the violation of plaintiff's rights.   Similarly, plaintiff makes no

3    particular factual allegations and submits no evidence against Holmes.  Finally, plaintiff

4    described Kennedy's role at the prison as a "facilitator," because "he was the sergeant that

5    always went around to every building and tried to resolve or tried to be . . trying to bring things

6    to peace."  Pl.'s Dep., at 85.  Plaintiff did not know whether Kennedy had any control over the

7    lockdown or the modified program, but named him as a defendant, "For him being in the same

8    lawsuit, for him knowing the ongoing process, that modified program," even though plaintiff

9    knew that Kennedy had no control over it.  *Id*., at 87.  In short, when asked whether Kennedy did

10   anything to violate plaintiff's rights, plaintiff conceded, "[n]o, he didn't do nothing to me."  *Id*.

11          Plaintiff has produced no evidence that defendants Hill, Holmes or Kennedy did anything

12   that affected him during the modified program or during any lockdowns.  Thus, there is no

13   evidence that they violated or caused anyone else to violate plaintiff's rights and there is no

14   genuine dispute for trial.  Accordingly, defendants' motion for summary judgment must be

15   granted.

16          For the reasons stated above, it is hereby RECOMMENDED that:

17          1.  The November 16, 2007, motion for summary judgment filed on behalf of Holmes,

18   Kennedy and Hill be granted;

19          2.  That judgment be entered in their favor; and,

20          3.  The Clerk be directed to close the case.

21          These findings and recommendations are submitted to the United States District Judge

22   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 15 days after

23   being served with these findings and recommendations, any party may file written objections

24   with the court and serve a copy on all parties.  Such a document should be captioned "Objections

25   to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the

26   ////

specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 9, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE